Bertha BRITTINGHAM, Claimant Below, Appellant,

v.

ST. MICHAEL'S RECTORY, Employer Below, Appellee.

No. 409, 2000.

Supreme Court of Delaware.

Submitted: Oct. 15, 2001.

Decided: Jan. 11, 2002.

Henry C. Davis, Esquire, of Henry Clay Davis, III, P.A., Georgetown, Delaware, for appellant.

Scott R. Mondell, Esquire and H. Garrett Baker, Esquire (argued), of Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices (constituting the Court en Banc).

HOLLAND, Justice.

This is an appeal from a final judgment of the Superior Court by the claimant-appellant, Bertha Brittingham. Brittingham sustained a compensable injury to her cervical spine during the course of her employment by the employer-appellee, St. Michael's Rectory. The Superior Court affirmed a decision by the Industrial Accident Board (the "Board") that Brittingham forfeited the right to continued compensation by refusing her employer's offer of reasonable medical treatment.

In this appeal, Brittingham argues that the Board and the Superior Court erred, as a matter of law, in construing the forfeiture provisions of DEL. CODE ANN. tit. 19, § 2353(a) (1995). In particular, Brittingham contends that a prior Superior Court decision, that was relied upon by the Board and the Superior Court in her case, set forth an incorrect construction of the forfeiture provision in Section 2353(a).[1] We have concluded that Brittingham's argument is meritorious. Therefore, the judgment of the Superior Court must be reversed.

### Facts

On December 22, 1998, Brittingham was injured in the course of her employment with St. Michael's Rectory (the "Employer"). The injury occurred when Brittingham lifted a carton weighing between twenty and twenty-five pounds. She felt something snap in her neck and experienced a burning sensation in her neck area as well as aching in her lower back. Following the accident, the parties entered into an agreement for total disability benefits as compensation due for the injury.

Subsequently, Brittingham began to seek treatment for her injuries from a board certified neurosurgeon, Dr. Balepur Venkataramana. Dr. Venkataramana advised Brittingham she was a candidate for cervical fusion surgery and he recommended using an anterior approach for the fusion. The proposed anterior approach entailed an incision on the left, front-side of the neck, exposure of the cervical spine, removal of a disk and filling the disk space with a piece of bone graft taken from Brittingham's hip. Brittingham did not consent to the proposed surgery. In 1990 she underwent neck surgery and did not

---

1. *Gen. Motors Corp. v. Vannicola,* No. 91A–02–5, 1992 WL 302028 (Del.Super.Ct. Aug.14, 1992).

want to undergo similar surgery again. Instead, she began a short course of physical therapy prescribed by Dr. Venkataramana, which ended when she could no longer tolerate the pain. Brittingham continued to take pain medication and a muscle relaxant.

Brittingham then sought additional medical opinions regarding the need for surgery and alternative options for treatment. When researching treatment options, Brittingham focused on her medical history. She believed her history of smoking and diagnosed osteopenia, a precursor condition to osteoporosis, might affect the outcome of the proposed surgery, which required bone harvesting to perform the fusion.

At the Employer's request, Brittingham consulted Dr. Paul Asdourian, a board certified orthopedic surgeon specializing in spinal surgery. She sought an additional medical opinion from Dr. Henry Shuey, a board certified neurosurgeon. Brittingham determined that she had three options: an anterior approach cervical fusion surgery; a posterior approach cervical fusion surgery; and no surgery, with treatments to assist her in coping with the injury's effects.

After considering her options, Brittingham chose not to have a cervical fusion surgery. The Employer insisted that she have the surgery or it would seek to terminate her total disability benefits. On May 25, 1999, the Employer filed a Petition for Review of the compensation agreement pursuant to DEL. CODE ANN. tit. 19, § 2353(a) (1995). The Employer alleged Brittingham unreasonably refused to undergo surgery and her refusal was the cause of her ongoing disability. The Board conducted a hearing on October 14, 1999 to determine the merits of the Employer's petition.

At the hearing, Dr. Asdourian testified by deposition for the Employer. Dr. Asdourian examined Brittingham in February and September 1999 and reviewed her medical records. He diagnosed her condition as a symptomatic degenerative disk at C5–C6 and opined that the anterior approach recommended by Dr. Venkataramana was preferred. Dr. Asdourian testified that Brittingham's concerns for her smoking history could be addressed with minimal additional risks by inserting a plate during surgery to help the healing of the bone graft.

Dr. Asdourian testified that a cervical fusion had a ninety-five percent predictable success rate and if properly performed the surgery posed a risk of not more than one percent. Dr. Asdourian predicted Brittingham's condition would get worse without the surgery since she could develop permanent nerve dysfunction in both arms. He further testified that it would not be totally unreasonable for her to decline the surgery. He believed that without the surgery she could continue her employment with minimal accommodations and was capable of sedentary work on a part-time basis.

Dr. Shuey testified by deposition for Brittingham. Dr. Shuey examined Brittingham and reviewed her medical records on March 31, 1999. He diagnosed her condition as a C6 nerve root impingement syndrome associated with neurological deficits probably stemming from her 1990 neck surgery. Dr. Shuey opined that Brittingham was a surgical candidate but that a posterior approach was a more appropriate method than the anterior approach for the fusion proposed by Dr. Venkataramana. The posterior approach entailed an incision on the skin over the spine, taking down the muscles, and drilling out the area between the lamina to create a doorway for the nerves.

Dr. Shuey remarked that Brittingham's history of smoking would increase the risk of failure for the fusion surgery. He believed the use of a plate would increase the surgery's success but would add a ten percent chance of esophageal dysfunction with swallowing difficulties. Dr. Shuey testified the success rates for the anterior or posterior approach were eighty percent for complete success, ten to fifteen percent for satisfactory results with residual symptoms, and a five percent failure rate. He believed Brittingham could expect a reduction in pain and improvement in neurological disk function but did not find it unreasonable for her to decline the surgery.

On October 26, 1999, the Board issued a decision determining that Brittingham had forfeited her rights to compensation for total disability pursuant to DEL. CODE ANN. tit. 19, § 2353(a) (1995). The Board decided Brittingham had refused reasonable surgery. It determined the surgery "reasonable" since all medical experts recommended the surgery and no doctor advised against it, her chance of improvement with surgery was considerable while the risk of complications was slight and her condition would not improve without surgery.

Although medical experts differed as to the approach for the cervical fusion surgery, the Board found that differing opinions did not affect the reasonableness of Brittingham's refusal since she could ultimately decide which approach she preferred. The Board further determined Brittingham's refusal of reasonable surgery caused her continuing incapacity. The Board emphasized its decision did not direct Brittingham to undergo the proposed surgery but that her refusal of rea-

sonable surgery forfeited her eligibility for total disability benefits.

Following the Board's adverse decision, Brittingham filed a timely appeal to the Superior Court. On July 25, 2000, the Superior Court issued a Memorandum Opinion affirming the Board's decision. On August 23, 2000, Brittingham appealed the Superior Court's Memorandum Opinion to this Court.

### Conflicting Superior Court Opinions

In this appeal, we must resolve a conflict in the Superior Court opinions that have interpreted DEL. CODE ANN. tit. 19, § 2353(a) (1995). The first sentence of that Section provides: "[i]f the employee refuses reasonable surgical, medical and hospital services, medicines and supplies tendered to the employee by the claimant's employer, the claimant shall forfeit all right to compensation for any injury or any increase in the claimant's incapacity shown to have resulted from such refusal."

In the context of this appeal by Brittingham, the specific question to be addressed is whether the reasonableness of the claimant's refusal of an employer's offer of reasonable medical treatment is a matter that must be considered by the Board. More than twenty-five years ago, the former President Judge of the Superior Court answered that question affirmatively in the case of *Wilmington Housing Authority v. Gonzalez.*[2] Approximately ten years ago, however, in the case of *General Motors Corporation v. Vannicola,*[3] another Judge of the Superior Court reached the opposite conclusion.

In Brittingham's case, after acknowledging the disparity between the opinions in *Gonzalez* and *Vannicola,* the Superior

**2.** *Wilmington Hous. Auth. v. Gonzalez,* 333 A.2d 172 (Del.Super.Ct.1975).

**3.** *Gen. Motors Corp. v. Vannicola,* No. 91A–02–5, 1992 WL 302028 (Del.Super.Ct. Aug.14, 1992).

Court affirmed the Board's decision to follow the holding in *Vannicola*. We have concluded, however, that the Superior Court's decision in *Gonzalez* reflects the proper construction of Section 2353(a). Therefore, the Superior Court's opinion in *Vannicola* is overruled. Consequently, the Superior Court's judgment that is before us on appeal in Brittingham's case must be reversed.

### *Reasonableness of Refusal*

■ This Court has held that in work-related claims, the employer takes the employee in the condition that he or she is found.[4] This individualized focus on each claimant's own condition permeates the entire Workman's Compensation Act and is reflected in the first sentence of Section 2353(a). The employer must tender reasonable medical treatment to a specific individual employee and it is that employee who will forfeit all right to compensation for a wrongful refusal. Accordingly, the statute requires the Board to determine whether the treatment is reasonable for that specific claimant and not whether the treatment is reasonable generally for anyone with the claimant's condition.

In *Vannicola*, the Superior Court held that " '[r]easonable medical treatment' is to be interpreted objectively based on the treatment, not subjectively based on the claimant."[5] That interpretation is contrary to the individualized focus of the Workman's Compensation Act. It is also inconsistent with the context of the entire first sentence in Section 2353(a).

In *Gonzalez*, the Superior Court properly recognized that reasonableness of the treatment offered by the employee was inextricably intertwined with the reasonableness of the employee's refusal.[6] *Larson's Workers' Compensation Law*, the leading authoritative treatise on the subject, states:

> The question whether refusal of treatment should be a bar to compensation turns on a determination whether the refusal is reasonable. Reasonableness in turn resolves itself into a weighing of the probability of the treatment's successfully reducing the disability by a significant amount, against the risk of the treatment *to the claimant*.[7]

■ As *Larson* notes, some types of treatment involve no risk. Therefore, a claimant's refusal to accept an offer of medical treatment with little or no risk properly results in a forfeiture of benefits that is attributable to any resultant harm. Conversely, *Larson* states that "[t]he problem of unreasonableness of refusal, and of weighing risk against probable benefit is … in its most acute form when the treatment takes the form of surgery."[8]

According to *Larson*, most appellate courts will not disturb an administrative tribunal's factual finding that refusal to submit to major surgical procedure is reasonable "since the question is a complex fact judgment involving a multitude of variables, including claimant's age and physical condition, claimant's previous surgical experience, the ratio of deaths from the operation, the percentage of cures and

---

**4.** *Reese v. Home Budget Ctr.,* 619 A.2d 907, 910 (Del.1992).

**5.** *Gen. Motors Corp. v. Vannicola,* No. 91A-02–5, 1992 WL 302028, at \*3 (Del.Super.Ct. Aug.14, 1992).

**6.** *See Wilmington Hous. Auth. v. Gonzalez,* 333 A.2d 172, 174–75 (Del.Super.Ct.1975).

**7.** 1 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 10.10[2], at 10–30 (2001) (emphasis added).

**8.** 1 *id.* § 10.10[6], at 10–34.

many others." [9] *Larson* concludes that if the risk involved is real and there is a distinct possibility of either no improvement or a worsening of the condition, the majority of courts have held that "the claimant cannot be forced to run the risk [of surgery] at [the] peril of losing his [or her] statutory compensation rights." [10] In *Gonzalez*, the Superior Court held:

> Section 2353(a) requires that the Board make at least three factual findings before compensation may be forfeited. The Board must find, first, that there was a refusal of service and, second, that the refusal caused an injury or increase in incapacity. Third, the Board must find that the particular services offered, whether involving vocational rehabilitation or regular medical services, were reasonable or, in other words, that the injured employee's refusal was unreasonable.[11]

The Superior Court's construction of the Delaware Workman's Compensation statute in *Gonzalez* is completely consistent with the majority rules summarized in *Larson*. In Brittingham's case, however, the Board's reliance upon *Vannicola* caused it to completely disregard the multitude of variables that it is required to consider in deciding the reasonableness of Brittingham's refusal.

### Brittingham's Refusal Variables

■ The record reflects that even a cursory examination of the record in Brittingham's case reflects the complexity of the variables that had to be factored into assessing the reasonableness of Brittingham's refusal to have surgery. First, the surgical procedure recommended for Brittingham was major: a cervical fusion. The employer's orthopedic medical expert, Dr. Asdourian, and Brittingham's treating neurosurgeon, Dr. Venkataramana, both recommended a cervical fusion with an anterior approach rather than a posterior approach. The anterior method involves an incision on the left, front side of the neck, exposure of the cervical spine, and removal of a disk. The disk space is then filled with a piece of bone graft. A plate can be used to hold the spine still in order to increase the *chance* of fusion. Dr. Asdourian recommended the anterior approach over the posterior approach because he felt it was *more likely* to be successful in the long run.

Second, Brittingham's physical condition was a relevant medical consideration. Since Brittingham is a smoker, Dr. Asdourian recommended the use of a plate. He explained that smokers have a decreased healing capacity for bone grafts and that the plate increases the success rate of the fusion. Dr. Shuey, a board certified neurosurgeon, who had been consulted by Brittingham for a second opinion, testified that he recommended the posterior approach for a cervical fusion because Brittingham is a smoker and has symptoms of unilateral pain. Since the Board erroneously applied *Vannicola's* exclusive focus on the reasonableness of surgery generally, it completely disregarded Brittingham's concern that the experts were divided on the specifics of the surgery.

Third, the risks of surgery were significant. In addition to the chance that the graft would not fuse, the risks of an anterior approach cervical fusion include the possibility of injury to the trachea and esophagus. Both the anterior and the posterior approach included the risk of injury to an artery and to various nerves, with a possibility of paralysis. In Brittingham's

---

**9.** 1 *id.* § 10.10[6], at 10–34, –35.

**10.** 1 *id.* § 10.10[6], at 10–34.

**11.** *Gonzalez*, 333 A.2d at 174–75.

case, the Board summarily dismissed the seriousness of the risks involved in any spinal fusion because in *Vannicola* the Superior Court held that the "risks [of] death, paralysis, infection, or no improvement . . . [were] inherent risks of any operation" and did not render the surgery unreasonable.[12]

Fourth, all three medical experts predicted a high rate of success. *Larson* notes, however, that a surgeon's perspective on a low percentage of serious injury or death might be different from a claimant's decision to "enjoy life as best he or she can with the injury rather than take a one-in twenty-chance of being dead."[13]

Fifth, Brittingham was not pleased with a prior surgical experience in 1990. Finally, both Dr. Asdourian, the Employer's expert, and Dr. Shuey, Brittingham's expert, testified that it would be reasonable for Brittingham to decline surgery. All of these factors should have been considered and addressed by the Board in determining the reasonableness of Brittingham's decision to refuse what the Employer offered as a reasonable medical treatment for her.

### *Work Return Alternative*

Because the Board found that Brittingham must forfeit total disability compensation because of her refusal to undergo "reasonable corrective surgery," it decided not to address the Employer's alternative contention that Brittingham is able to return to work without a loss of earnings. Section 2353(c) provides the basis for the Employer's alternative argument. That Section states: "[i]f an injured employee refuses employment procured for the employee and suitable to the employee's capacity, the employee shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Board such refusal was justifiable."

In this case, the record reflects Dr. Asdourian asserted that Brittingham is currently capable—without an operation—of sedentary work on at least a part-time basis. Moreover, the Board summarized the Employer's offer of employment as follows:

Father William Grainey, the pastor at St. Michael's, testified on behalf of St. Michael's. Father Grainey testified that, as the parish secretary, Claimant answered the phone, did some typing, kept the computer records up-to-date, made copies, and paid bills. She also dealt with the parishioners. Since Claimant left in December 1998, St. Michael's has left her position open and is waiting for her to return. Since then, volunteers have performed the majority of her duties.

Father Grainey asserted that the church would have no problem making accommodations for Claimant's work restrictions. There are usually other people around to help with any lifting and if Claimant were ever alone she could defer certain tasks until someone was there to help her. Father Grainey asserted that he would welcome Claimant back into the position at the same rate of pay and at the same number of hours. He would also consider someone with her physical limitations as a replacement for her.[14]

---

12. *Gen. Motors Corp. v. Vannicola*, No. 91A–02–5, 1992 WL 302028, at *3 (Del.Super.Ct. Aug.14, 1992).

13. 1 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 10.10[6], at 10–35 (2001).

14. *Brittingham v. St. Michael's Rectory*, I.A.B. No. 1140201 (Oct. 14, 1999).

The Employer also presented testimony by a vocational consultant, Thomas Dimeo, who had performed a market labor survey to determine the availability of sedentary employment for Brittingham. Mr. Dimeo concluded that entry sedentary positions were highly available in the Delaware labor market.

In our view, that is the argument in the first aspect of the Petition for Termination of Benefits that the Board should have addressed. In fact, this Section 2353(c) argument was listed in the Petition for Termination as the Employer's primary contention. The Section 2353(a) argument was listed under "other."

■ One of the primary goals of the Delaware Workman's Compensation statutory scheme is to return individuals to the work force. If an employer contends that a claimant can be returned to the work force immediately, it is not either logical or fair to defer considering that argument in favor of requiring the claimant to choose between major surgery and a forfeiture of benefits.[15]

### Conclusion

The Superior Court's decision in *Vannicola* is overruled. The judgment of the Superior Court is remanded to the Superior Court for further proceedings in accordance with this opinion by the Board. Upon remand to the Board, the Employer's argument pursuant to Section 2353(c) should be addressed first. If the Board decides the Employer's argument pursuant to Section 2353(a), it must address all three points identified in *Gonzalez*.

---

**15.** *Mosley v. Bank of Delaware,* 372 A.2d 178, 180 (Del.1977).